IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GREGORY BERNARD PAUL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:12-CV-00130-G (BH) |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed June 14, 2012 (doc. 10), and *Defendant's Motion for Summary Judgment*, filed July 16, 2012 (doc. 11).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **GRANTED in part**, Defendant's motion should be **DENIED in part**, and the case should be **REMANDED** to the Commissioner for further proceedings.

## I. BACKGROUND[1]

### A.   Procedural History

Gregory Bernard Paul (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for disability benefits and supplemental security income under Titles II and XVI of the Social Security Act.  (R. at 34–42.)

---

[1]   The background information comes from the transcript of the administrative proceedings, which is designated as "R."

On March 3, 2009, Plaintiff applied for disability insurance benefits and supplemental security income, alleging disability beginning on July 21, 2007, due to depression and bipolar disorder. (R. at 205–14, 252.) His applications were denied initially and upon reconsideration. (R. at 33.) He timely requested a hearing before an Administrative Law Judge (ALJ). (*Id.*) He personally appeared and testified at a hearing held on January 5, 2010. (R. at 44–116.) On April 28, 2010, the ALJ issued his decision finding Plaintiff not disabled. (R. at 34–42.) He requested review of the ALJ's decision, and the Appeals Council denied his request on November 4, 2011, making the ALJ's decision the final decision of the Commissioner. (R. at 17–20.) He timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (doc. 10.)

B.   **Factual History**

1.   **Age, Education, and Work Experience**

Plaintiff was born on December 18, 1964. (R. at 128.) At the time of the hearing before the ALJ, he was 45 years old. (R. at 52.) He graduated high school, attended college for one year, and studied "welding technology" at a vocational school. (R. at 52–53.) He has past relevant work as a construction worker and a welder. (R. at 102–03.)

2.   **Psychological and Psychiatric Evidence[2]**

Plaintiff began receiving psychiatric and psychological treatment at Dallas Metrocare Services (Metrocare) on July 20, 2007. (R. 296). At his initial consultation, he told Metrocare clinician Shelly Sullivan that he had recently been released after being incarcerated for six months on fraud charges. (*Id.*) He reported feeling depressed most of his life but "ha[d] no [history] of taking psychiatric medication." (*Id.*) He had "smoked crack cocaine since 1995" and was admitted

---

[2] Because this action only involves a mental impairment, the record does not contain any medical evidence.

"to 3 different rehabilitation facilities to treat his drug habit but he ... always [went] back to smoking." (*Id.*)  He told clinician Sullivan that he "believe[d] he [was] ready to abstain at [that] time." (*Id.*)  He reported "irritability and anger issues" but denied any suicidal or homicidal ideations. (*Id.*)  The clinician found he was pleasant, oriented, and displayed no "overt psychotic features." (*Id.*)

On July 26, 2007, Sylvia Moring, M.D., a Metrocare psychiatrist, interviewed Plaintiff and completed a psychological evaluation. (Tr. 298).  Plaintiff told Dr. Moring that he "worked as [a] welder for many years" but had a long history of difficulty maintaining employment, usually getting laid off after four or five months on the job. (*Id.*)  Dr. Moring noted that he "usually describe[d] himself as [a] victim." (*Id.*)  He admitted to a history of drug abuse and told her that "when situations [went] badly, he would binge on alcohol [and] cocaine." (*Id.*)  He began drinking alcohol at age 19 and using cocaine at age 32. (*Id.*)  He had been sober for seven months, including his time in jail. (*Id.*)  He "ha[d] family support and want[ed] to change." (*Id.*)

Plaintiff's mood was "indifferent;" he complained of being "depressed all the time, but feel[ing] good [and] high at the same time;" his affect was "mildly anxious;" he slept on average four hours a night but still felt rested; he always had a good appetite; he had no particular interests; his energy level was "high [and] good;" and he showed no signs of anxiety, panic attacks, or suicidal or homicidal ideations. (*Id.*)  He was alert and cooperative; made "good eye contact;" his speech was normal and coherent; his thoughts were goal-oriented—although "not always completely logical;" his memory was intact; he was oriented; and he had "very poor" insight and judgment. (R. at 299.)

Dr. Moring prescribed Plaintiff Valproic Acid and Celexa for his depression. (*Id.*)  She also recommended that he receive "individualized skills training" sessions to develop "skills such as time

management, daily living, anger management, [and] problem solving." (R. at 300.) Assisting clinician Dwight Ausbrooks noted that among Plaintiff's "barriers" were his unemployment and his difficulty securing a job due to his criminal history. (*Id.*) The clinician referred him to a local grocery store "to inquire if they needed additional staff" and called the "Texas Rehabilitation Commission" (TRC) to help him gather information about their program. (*Id.*) Plaintiff "was happy to get [the] information [about] TRC and stated that he would apply ... for services" the next day. (*Id.*) Clinician Ausbrooks noted he had "substance abuse issues" but opined that he was "at the contemplation state of change and all [of] his basic needs are met." (*Id.*)

On August 23, 2007, Plaintiff returned to Metrocare for a medication check. (R. at 302). He told Natasha Simmons, the attending nurse practitioner (NP), that he was still depressed but his mood and energy level were stable and he was "sleeping well." (R. at 303). He denied any hallucinations, delusions, or suicidal or homicidal ideations. (*Id.*) NP Simmons increased his dosage of Celexa and scheduled a follow-up appointment. (*Id.*) He attended a "group skills training" session the next day to improve his "eating habits" and learn "helpful hints on controlling [his] hunger." (R. at 304.) He claimed that he was "eating the right way" and most of the information taught was "for people that [did] not know how and what to eat." (*Id.*) Clinician Ausbrooks opined that he remained "at the pre-contemplation stage of change" regarding his drug abuse because he "deni[ed] that he ha[d] a problem." (*Id.*)

On September 20, 2007, Plaintiff presented to Metrocare for another medication check. (R. at 307–08.) He told NP Simmons that he was "stable on [his] current medications," did not have any mood swings, and was sleeping and eating well. (R. at 308.) NP Simmons "continue[d] [his] current medications." (*Id.*) He returned the following month for "medication training and support."

(R. at 309–11.)  The session focused on "maintaining sobriety" and avoiding "the negative effects of mixing alcohol [and] drugs with prescription medication." (R. at 310.)

On November 16, 2007, Plaintiff received an "individualized skills training" session regarding stress-management.  (R. at 313.)  He told Ellen Garrison, the attending clinician, that he was "becoming more depressed and stressed because of his financial and homeless situation" and his stress and depression "affect[ed] him to a point where he [was] not motivated to do anything." (*Id.*)  Clinician Garrison opined he was making progress because he could "better understand why he [felt] the way he [did], ... [knew] that he [had] control over his situation in life," and "was able to process how his body react[ed] to stress and anxiety."  (*Id.*)  Despite his "history of substance abuse," she opined that he was "at the action stage of change" and was "abstaining from using any illegal substance."  (*Id.*)  He told the clinician that he could not "handle not having any income and living on the streets."  (*Id.*)  She referred him to the "Dallas Life Foundation and Salvation Army for temporary shelter" and suggested a few employment options.  (*Id.*)

On December 31, 2007, Plaintiff returned to Metrocare for a "pharmacological management" session.  (R. at 315.)  He complained of increased depression, sadness, irritability, and agitation despite sleeping seven hours a night.  (R. at 317.)  He was found to be oriented, his memory was intact, his thoughts were logical, he had no manic symptoms or racing thoughts, and he denied any hallucinations or homicidal or suicidal ideations.  (*Id.*)  The clinician increased his dosages of Valproic Acid and Celexa.  (*Id.*)

On January 28, 2008, Plaintiff participated in another skills-development session and learned about "time management, daily living, anger management, problem solving, [and] coping."  (R. at 318.)  He told the attending clinician that he was "looking for work [but] [was] unable to find any work."  (*Id.*)  The clinician advised him to apply for social security disability benefits.  (*Id.*)  He

reported occasional agitation and irritability because he was homeless and requested information about a "treatment center." (R. at 321). The clinician found that he was oriented, his memory was intact, his judgment and concentration were fair, he was appropriately groomed, and he denied any suicidal or homicidal ideations or hallucinations. (*Id.*) The clinician refilled his medications and referred him to a social worker regarding his housing situation. (*Id.*)

On February 25, 2008, Plaintiff presented for another "medication check." (R. at 323.) He told NP Simmons that he was feeling "stable" with his current medications. (R. at 324). His mood and depression were stable, he was sleeping five to eight hours a night, and he experienced no agitation or irritability. (*Id.*) He was still "homeless" and living in a transitional facility. (*Id.*) NP Simmons "continue[d] [his] current medications." (*Id.*)

On March 24, 2008, Plaintiff presented for a therapy session on "abstain[ing] from ... alcohol [and] illegal drugs and maintain[ing] sobriety." (R. at 325.) He told clinician Brooks that he was trying to "stop using drugs but [would] need help." (*Id.*) The clinician opined that he "lack[ed] the incentive to continue [the] steps to abstain [from] using alcohol or any illegal substance at [that] time." (*Id.*) He informed Plaintiff about the dangerous "combination of [his] mental health disorder and an addiction, ... as well as the need for taking [his] prescribed medications and avoid[ing] mixing [them] with alcohol." (*Id.*) Plaintiff identified two ways that "his mental problem [had] affected his home and relationships, and [his] inability to maintain a stable relationship and liv[e] independently." (*Id.*) He admitted having "a drug problem" but claimed that it was "the only way he [knew] how to cope with being homeless at [that] time." (*Id.*) Clinician Brooks told him that he was making "progress" by "acknowledging [his] drug problem and wanting help to stop using." (*Id.*) Plaintiff's depression was "stable," he had "no mood swings," and he was sleeping well. (R.

at 328.)  He was groomed appropriately, his thoughts were logical, his judgment was fair, and he experienced no hallucinations, delusions, or suicidal or homicidal ideations.  (*Id.*)

On May 16, 2008, Plaintiff presented for a medication check and a "skills training" session. (R. at 330.)  The clinician Brooks noted that he appeared "[n]eat but needing to improve [his] person[al] hygiene." (*Id.*)  He claimed he was "trying to abstain from the use of crack/cocaine but it was difficult [because] he [was] homeless, but he want[ed] to change and not use." (*Id.*)  The clinician encouraged him to attend the local Alcoholics Anonymous.  (*Id.*)

That day, Plaintiff learned "how to recognize [his] assertive rights, [which] offer[ed] [him] a sense of control and dignity, and empower[ed] him." (*Id.*)  He complained that it was "difficult being assertive when he [was] homeless and depend[ed] on hand outs for [al]most everything." (*Id.*) Clinician Brooks referred him to the "transitional housing staff ... to be placed on the waiting list for housing, provid[ed] [that] he [got] help with his addiction to crack/cocaine." (R. at 331.)  The clinician noted that he was "[a]lways polite and positive about his situation" and encouraged him to attend Alcoholics Anonymous.  (*Id.*)  Plaintiff complained of having "difficulty sleeping due [to] being homeless and living on the street," but he "refuse[d] to go to a shelter," explaining that he was "awaiting transitional housing." (R. at 334.)  He was "disheveled" and "melancholic," but denied having agitation, depression, delusions, hallucinations, or suicidal or homicidal ideations.  (*Id.*)

On June 18, 2008, Plaintiff learned about "conflict resolution." (R. at 336.)  He identified current conflicts in his life as his lack of housing and income and "getting denied for social security benefits and emergency housing." (*Id.*)  His medications were refilled that day. (*Id.*)  On August 26, 2008, he returned for a "routine follow-up." (R. at 350.)  Angela P. Allen, the attending clinician, gave him information about "other shelters and housing resources" and encouraged him to continue working on his applications for social security disability and the "bridge program." (R.

at 351.)  When she asked him about "being able to work, he [said] that he [could not] because of his disorder."  (*Id.*)  The clinician found that his "grooming and hygiene were normal" and he appeared to be "very knowledgeable[,] intelligent[,] and stabilized on his med[ications]."  (*Id.*)  She suspected that his drug use "could be hindering him in getting help through the bridge program."  (*Id.*)

Plaintiff returned for a medication check on October 21, 2008.  (R. at 357.)  He told Nnenna I. Lindsay, the attending clinician, that he was "hearing voices and seeing shadows."  (R. at 360.) "He ha[d] been taking cocaine" and the "last time he used [cocaine] was [the] [previous] week." (*Id.*)  "He said it help[ed] him relieve his symptoms, especially his anger."  (*Id.*)  He "ha[d] been feeling very depressed and angry" and "[c]ocaine put[] [him] back into perspective."  (*Id.*)  He was "currently staying at the Bridge" homeless shelter, and felt "like he [was] being put down and criticized there."  (*Id.*)  Plaintiff was "tired of being treated like dirt by institutions," which "ma[de] him angry [and] cocaine ma[de] him feel better."  (*Id.*)  Clinician Lindsay "taught [him] about the dangers of [using] drugs and the importance of taking [his] medications as prescribed."  (*Id.*)  She referred him to "anger management classes" and gave him "a bus pass."  (*Id.*)   She noted that he "refused to attend ... the anger management classes" and narcotics anonymous, stating that they "would not help;" he "did not express any desire to quit taking drugs;" "did not have any goals;" and was "still experiencing symptoms associated with [his] disorder."  (R. at 360–61.)  The clinician opined that his strengths were his intelligence and being "articulate", and his weakness was his "unwillingness to change."  (*Id.*)  She encouraged him to "come up with goals, quit doing drugs, and ... find stable housing."  (R. at 361.)

Plaintiff returned on December 31, 2008, and reported being out of his medications.  (R. at 365).  Clinician Garrison found that he was "pleasant" and groomed appropriately, and his speech was "non-pressured."  (*Id.*)  He "continue[d] to live at the bridge homeless shelter," had difficulty

sleeping, felt fatigued and restlessness in the morning, and experienced agitation, irritability, and anger most of the time. (*Id.*)  His thoughts were "logical", and he had "no racing thoughts" or "crying spells." (*Id.*)  He complained that he did not "have tolerance for people after an hour or so" and he tended to "get really agitated and angry with people." (R. at 368.)  Clinician Garrison opined that he "need[ed] help dealing with his anger." (*Id.*)  Although he was "very responsive to [the] skills training," he did not believe he "need[ed] to change." (*Id.*)  He "continue[d] to use drugs" and had last used drugs the previous week. (*Id.*)

Clinician Garrison also completed a psychological evaluation. (R. at 293.)  She diagnosed Plaintiff with bipolar disorder I and alcohol and cocaine abuse, and assigned him a Global Assessment of Functioning (GAF) score of 40.[3]  (R. at 293.)  She noted he was experiencing "episodic financial difficulties in meeting [his] basic needs such as paying for food, medicine, or healthcare, and ha[d] moderate housing instability." (*Id.*)  She recommended he attend 28 counseling sessions covering topics such as "medication training and support," skills training, and individual and group psychotherapy. (R. at 294.)

On January 21, 2009, Plaintiff requested help from clinician Garrison for filing a social security disability claim. (R. at 372.)  He believed he had applied for benefits by obtaining treatment at Metrocare. (*Id.*)  Clinician Garrison referred him to the Social Security office and told him to take the forms to Metrocare if he needed help completing them. (*Id.*)  She also gave him a list of social security attorneys. (*Id.*)  She noted that he had no income, had "been staying in shelters for years,"

---

[3]   GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 31 to 40 indicates some impairment in reality testing or communication or a major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

had "been on and off drugs and alcohol for several years," and he did not "want to work." (*Id.*) She told him he should "work if he want[ed] income" and "suggested [he] get a job where he [was] paid [in] cash so he [could] still apply for social security" benefits. (*Id.*)

On February 3, 2009, Plaintiff reported difficulty sleeping and feeling agitated and irritable since running out of his medications. (R. at 375.) He was also depressed and frustrated because he could not complete his disability application due to his "poor attention span" and inability to focus. (*Id.*) The attending clinician prescribed him Remeron for his insomnia, Celexa for his depression, and Vaproic Acid for his agitation and irritability. (*Id.*)

On March 27, 2009, Margaret Meyer, M.D., a state agency medical and psychological consultant (SAMC), reviewed Plaintiff's treatment records and completed a Psychiatric Review Technique Form (PRTF) and a mental Residual Functional Capacity (RFC) assessment. (R. at 382–99.) In her PRTF, Dr. Meyer compared Plaintiff's mental impairments to listings 12.04 for "affective disorders" and 12.09 for "substance addiction disorders." (R. at 386.) She diagnosed him with bipolar disorder. (R. at 389.) Dr. Meyer opined that he had a "mild" restriction in his activities of daily living, "moderate" restrictions in social functioning and in maintaining concentration, persistence, and pace, and he had not experienced any episodes of decompensation of extended duration. (R. at 396.) She noted that he began receiving psychiatric treatment at Metrocare in 2007, "binged on cocaine and alcohol," was "in and out of jail," had "recently [been] incarcerated [for] 6 months," and had "been in rehab[ilitation] but never seriously stopped [using] drugs." (R. at 398.) She noted his long history of drug and alcohol abuse and pointed to Metrocare treatment notes from October 2008 indicating that he had used cocaine the previous week and reported "feeling depressed [and] angry," which she opined was "fairly typical for cocaine [withdrawal]." (*Id.*) She noted that

he was homeless, read and studied, took "a couple [of] walks throughout the day," prepared meals, used public transportation, and shopped.  (*Id.*)  She found he socialized and attended "social groups."  (*Id.*)  She concluded that his "allegations [were] not wholly supported by [the medical evidence of record]."  (*Id.*)

In her mental RFC assessment, Dr. Meyer opined that Plaintiff had "moderate limitations" in 13 work-related mental abilities, including his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; complete a normal workday or workweek without interruptions from psychologically based symptoms; work at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers without distracting them or exhibiting behavioral extremes.  (R. at 382–83.)  She opined that he was "not significantly limited" in seven areas, including his ability to understand, remember, and carry-out very short and simple instructions; make simple work-related decisions; and ask simple questions or request assistance. (*Id.*)  She concluded that he had the following mental RFC: "understand, remember, and carry out detailed but non-complex instructions, make important decisions, attend and concentrate for extended periods, interact with others, [and] accept instructions and respond to changes in a work setting."  (R. at 384.)  She opined that the "[a]lleged severity of [his] limitations [were] not supported by [the evidence of record]."  (*Id.*)

On April 21, 2009, Plaintiff returned to Metrocare and reported some improvement with his symptoms.  (R. at 419.)  He told Ben Murphy, the attending clinician, that he had an argument with

another Bridge resident but "was able to control" himself, and he believed that his medications were helping him in that regard. (*Id.*)   He reported abstaining from drugs and alcohol, being compliant with his medications, and attending his counseling sessions and anger management classes regularly. (*Id.*) Clinician Murphy completed a psychological assessment. (R. at 401.) He diagnosed Plaintiff with bipolar disorder I and alcohol and cocaine abuse, and assigned him a GAF score of 40. (*Id.*) The clinician opined that he had a "clear" "ability to care for [him]self," had "minor but consistent difficulties in social role functioning," was "living with other persons due to an inability to afford housing," and had "[n]o need or desire to work." (*Id.*)

On May 18, 2009, Plaintiff told Gregory Graves, M.D., a Metrocare psychiatrist, that he was feeling more depressed, and his mood was "in limbo." (R. at 423.) Dr. Graves diagnosed him with bipolar disorder I and alcohol and cocaine abuse. (*Id.*) Dr. Graves changed his medications and recommended "blood monitoring" to optimize their efficacy. (*Id.*) On May 28, 2009, Dr. Graves found Plaintiff to appear depressed with restricted affect. (R. at 429.) Plaintiff told him that he was "doing as well as [could] be expected in [his] circumstances," was sleeping eight hours a night, and had no suicidal or homicidal ideations. (*Id.*) His mood was "stable" and he was "sleeping pretty good," but he felt a "little more depressed since [being] off Celexa." (R. at 470.) That day, he told a clinician that he was "doing just fine [and] everything [was] coming along well," his mood was "more stable" on his medications, and he was sleeping "pretty good." (R. at 492.)

On June 24, 2009, Plaintiff told a Metrocare clinician that he continued to abstain from drugs and alcohol. (R. at 469.) He had auditory hallucinations and increased depression. (Tr. 470.) The clinician noted he was "clean and well groomed, as evidenced by [his] fresh, neat clothing," his insight and judgment were "fair," and he was "alert" but "anxious about [his] social security case."

(R. at 473.)  She restarted his Celexa and continued his other medications.  (*Id.*)

On June 29, 2009, Marian Hubbard, a Metrocare clinician and "substance abuse specialist," completed a psychological evaluation.  (R. at 453.)  She assigned Plaintiff a GAF score of 40.  (*Id.*) She found that he had "flight of ideas;" was highly distractible, tangential, and irritable; displayed reckless behavior and poor judgment; had poor decision-making, social, and coping skills; showed criminogenic thinking; and reported feelings of hopelessness, downheartedness, and despair.  (*Id.*) He told the clinician he sometimes had thoughts that "made [him] want to hurt someone" and he exhibited "poor social and coping strategies due to exacerbation of [his] [symptoms]."  (*Id.*)  He also reported being sober for three months.  (*Id.*)

On June 30, 2009, Mark Boulos, M.D., another SAMC, reviewed Plaintiff's treatment records and completed a PRTF and a mental RFC.  (R. at 443–49.)  Dr. Boulos compared Plaintiff's mental impairments to listings 12.04 for "affective disorders" and 12.09 for "substance abuse addiction disorders."  (R. at 433.)  He opined that Plaintiff had moderate limitations in his activities of daily living, social functioning, and in maintaining concentration, persistence, and pace, and had not experienced any episodes of decompensation.  (R. at 443).  Dr. Boulos opined that Plaintiff had marked limitations in his ability to understand, remember, and carry out detailed instructions, and had moderate limitations in his ability to interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting.  (Tr. 447–48).  He opined that Plaintiff had no significant limitations in 15 other work-related mental abilities.  (*See id.*)

On July 2, 2009, Plaintiff told a Metrocare clinician that he had "rather persistent" auditory and visual hallucinations.  (R. at 481.)  He was angry, with blunted affect, fidgety, and "appear[ed]

to be responding to internal stimuli." (*Id.*)  The clinician opined that his progress toward recovery was "minimal" because he was "very angry," displayed a "hostile disposition," was unable to focus on his recovery, and was non-compliant with his treatment. (*Id.*)

By July 8, 2009, Plaintiff still reported hallucinations. (R. at 485). A clinician noted he seemed angry with blunted affect. (*Id.*) He showed interest in the group discussion and actively participated, but his progress remained "minimal" due to his "lack of attendance to anger [management] classes" and his medical non-compliance. (*Id.*) He attended a stress and anxiety management class the following week. (R. at 489.) He "wore sunglasses [and] refused to remove them during [the] group" discussion. (*Id.*) He reported doing "better" and refilled his medications. (R. at 491–93). At a subsequent session, he "showed some progress" by "self-report[ing]" his "problems associated [with] criminal thinking." (R. at 498.)

Throughout August and September 2009, Plaintiff attended several individual and group counseling sessions. (R. at 506–34.) During an individual session on August 30, 2009, he told the attending clinician that his medications were helping but he was "still feeling bad in [his] mood," was "irritable and down at times," and saw shadows every day. (R. at 539.) The clinician noted that his psychomotor behavior and speech were normal; his memory was intact; his attention was impaired; his insight, judgment, and impulse were good; his affect was restricted; and he showed no signs of psychotic features. (R. at 541.) On September 26, 2009, he told a clinician that his progress in anger management was "minimal" and his "episodes of anger ha[d] increased, but he [was] able to identify the stressors." (R. at 536.)

On October 5, 2009, he presented for a medication assessment. (R. at 544.) The clinician found he was "clean and well groomed" and "goal directed" and displayed an "inquisitive [and]

bright affect." (*Id.*)  He was alert and oriented and denied any suicidal or homicidal ideations.  (*Id.*)

The clinician opined that his progress was "marked," as "evidenced by [his] resolve, [positive]

attitude, [medical] compliance, [and] reduction in angry episodes [and] anxiety episodes."  (R. at

544–45.)  The clinician also found that he "was able to problem-solve through [his] barriers."  (R.

at 45.)  Additionally, he and Metrocare "staff [would] work together on getting ready for [his] social

security hearing [the following] week."  (*Id.*)  During a subsequent group session, he was noted to

have "difficulty keeping the focus on himself" and "tended to blame [his] roommate for negatively

affecting him and his family."  (R. at 546.)  After being redirected by the clinician, he "sat with a

defiant affect throughout the remainder of the group" discussion.  (*Id.*)  During a routine visit the

following week, he told the clinician he was being more "patient" and was "looking toward the

future."  (R. at 549.)  The clinician found him to be alert, oriented, adequately groomed, and

cooperative.  (*Id.*)  He showed no signs of psychomotor agitation or psychotic features; his thoughts

were organized; his affect was restricted; his memory was intact; and his insight, judgment, and

impulse were good.  (*Id.*)

Osman Ali, M.D., a Metrocare psychiatrist, began treating Plaintiff on January 19, 2010.

(R. at 583).  Dr. Ali found Plaintiff had a restricted affect, impaired attention, feelings of impending

doom, and irritability.  (R. at 583–84).  Dr. Ali noted that he was alert, oriented, cooperative, and

adequately groomed; his speech was normal; his thoughts were organized; his memory was intact;

and his insight, judgment, and impulse were good.  (R. at 583.)  He displayed no signs of

psychomotor agitation and had no delusions.  (*Id.*)  Dr. Ali diagnosed him with bipolar disorder type

I and alcohol and cocaine abuse, prescribed him Seroquel, and increased his dosage of Celexa.  (R.

at 584).

On January 26, 2010, Dr. Ali evaluated Plaintiff and completed a "Medical Assessment of Ability to do Mental Work-Related Activities." (R. at 553–55.) Dr. Ali opined that he was "extremely limited" or had "no useful ability" in 10 mental work-related abilities, including his ability to apply common sense to carry out detailed but uninvolved instructions; maintain attention and concentration for two hours; work at a consistent pace without an unreasonable number and length of rest periods; ask simple questions and request assistance; accept instructions and respond appropriately to criticism from supervisors; behave in an emotionally stable manner; respond to changes in the work setting; and cope with normal work stress without exacerbating pathologically-based symptoms. (*Id.*) Dr. Ali opined that he was "substantially limited" in five abilities: apply commonsense to carry-out simple instructions; maintain regular attendance and be punctual within customary tolerances; act appropriately with the general public; make simple work-related decisions; and get along with co-workers without distracting them or exhibiting behavioral extremes. (*Id.*)

Dr. Ali assigned Plaintiff a GAF score of 47.13. (R. at 554.) Plaintiff's symptoms included anhedonia, sleep disturbance, paranoia, low energy, chronic disturbance of mood, psychomotor agitation or retardation, difficulty thinking or confusion, flight of ideas, racing thoughts, chronic depression, hallucinations and delusions, and anger outbursts. (*Id.*) Dr. Ali estimated that Plaintiff would have more than four absences from work a month due to his impairments and opined that progress notes describing him as "stable," "doing well," and "doing OK" did not conflict with his psychiatric findings. (Tr. 555). Lastly, Dr. Ali opined that Plaintiff's mental impairments and limitations were independent of any alcohol or drug use. (*Id.*)

On June 14, 2010, Plaintiff saw Dr. Ali for a follow-up consultation. (R. at 557). Plaintiff measured 64 inches and weighed 225 pounds. (*Id.*) Dr. Ali's mental status examination revealed

hypervigilence, delayed speech, signs of psychotic features, auditory hallucinations, somatic delusions, poor insight, impulse, and judgment, somatic behavior, and fatigue. (R. at 559). He found that Plaintiff was oriented and adequately groomed; he displayed no psychomotor agitation; his thoughts were organized; his appetite was good; and he had no suicidal or homicidal ideations. (*Id.*) Dr. Ali diagnosed him with bipolar disorder with psychosis and changed his medications. (*Id.*) Dr. Ali also wrote a disability letter stating that he was treating Plaintiff for his bipolar disorder, which was characterized by fluctuating moods, difficulty concentrating, insomnia, restlessness, racing thoughts, pressured speech, anhedonia, irritability, paranoia, beliefs of persecution, and self-referential thinking. (R. at 562.) Dr. Ali opined that Plaintiff was unable to work. (*Id.*) He noted Plaintiff's abstinence from cocaine and his limited alcohol consumption of "two beers a week." (*Id.*)

On July 14, 2010, Dr. Ali completed a Psychiatric and Psychological Impairment Questionnaire. (R. at 569–77). He diagnosed Plaintiff with bipolar disorder, assigned him a GAF score of 45, and opined that his prognosis was "fair to poor." (R. at 569.) Plaintiff's symptoms included poor memory, sleep and mood disturbance, emotional lability, delusions and hallucinations, paranoia, feelings of guilt and worthlessness, difficulty concentrating, suicidal ideations, manic syndrome, hostility, and irritability. (R. at 570.) Plaintiff's primary symptoms were "fluctuating irritable mood, paranoia, and disordered thinking." (R. at 571.) Dr. Ali opined that Plaintiff was "markedly limited" or was "effectively precluded" in 21 work-related abilities, including his ability to remember locations and work-like procedures; understand and remember simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms; work at a consistent pace without an

unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers without distracting them or exhibiting behavioral extremes.  (R. at 573–74.)

Dr. Ali found that Plaintiff had experienced episodes of decompensation that caused him to withdraw from others because he was "paranoid about [his] co-workers [and] supervisors."  (R. at 575.)  Dr. Ali also noted that Plaintiff had "worked before unsuccessfully," and opined that he could not tolerate even a "low stress" work environment.  (R. at 576.)  He estimated that Plaintiff would have more than three absences from work a month due to his impairments, and stated that his limitations were unrelated to his ongoing alcohol use, which he believed was "common" "for people with Bipolar Disorder."  (Tr. 577).  Dr. Ali also assigned him a GAF score of 46 and found that he had "fleeting suicidal or homicidal thoughts, impulses, and ideations."  (R. at 580.)

### 3.  Hearing Testimony

On January 5, 2010, Plaintiff and a vocational expert testified at a hearing before the ALJ.  (R. at 44–116.)  Plaintiff was represented by an attorney.  (R. at 44.)

#### a.  *Plaintiff's Testimony*

Plaintiff testified that he was 45 years old.  (R. at 52.)  He graduated high school, attended college for one year, and studied "welding technology" at a vocational school but did not complete the program.  (R. at 52–53.)  He could read and write and perform basic arithmetic with a calculator.  (R. at 53.)  He measured 64 inches and weighed 228 pounds, which was his "normal weight."  (*Id.*)

Plaintiff was convicted of fraud—a felony—within the past ten years.  (R. at 53–54.)  He was charged with "cashing [a] check [that] was fraudulent" because the maker's signature was "possibly" forged.  (R. at 54.)  He cashed "fraudulent checks" on "various occasions," and was incarcerated for

six months for each occurrence for a total of five to six years.  (R. at 55.)  He had a problem with alcohol and cocaine and had gone to "rehab" "many times."  (*Id.*)  The last time he used alcohol was "a couple of days" before the hearing, he "shared a little champagne" with a friend on New Year's Eve.  (R. at 56.)  He last used cocaine nine months before the hearing.  (*Id.*)  After his release from jail, he began receiving psychiatric treatment at Metrocare.  (*Id.*)

Plaintiff had not been incarcerated since July 21, 2007, his alleged onset date.  (*Id.*)  He had not received unemployment benefits since that date.  (*Id.*)  He was currently unemployed and had not worked since his alleged onset date, except for doing "some yard work [and] things like that." (*Id.*)  Several Metrocare clinicians had encouraged him to work for cash "so he [could] still apply for Social Security" disability benefits.  (R. at 58.)   The ALJ interpreted that advice as "encourage[ment] ... to go out and work for cash so that [SSA] would still award [him] benefits because [it] would never find out about [his] work if [he] [was] receiving cash." (R. at 59.)  Plaintiff did not interpret the advice that way because he was "aware that [he] [could] work and make up to a certain amount" and still be eligible for benefits.  (R. at 59–60.)  He was not working for cash.  (R. at 61.)

Plaintiff last worked in 2008 for "Mart Inc.," where he "drove cars at auctions."  (R. at 62.)  He stopped working there due to "conflicting interests."  (*Id.*)  He also "had problems with the work in itself," he "signed on as a welder" but "was being suppressed into a position to help someone else," "to the point where … [he] was always late" for work.  (R. at 63.)  He had to "take a test" but was not "given the time to practice" for it.  (*Id.*)

Plaintiff also worked at "Manhelm" and a "temp. service" for a long time.  (R. at 64.)  He worked as a "welder" for Mart Inc. in 2008.  (R. at 65.)  He worked there for a couple of months,

but he could not remember how much he earned.  (*Id.*)  He could not remember where he worked during the third and fourth quarters of 2008.  (*Id.*)  He also worked for several temporary placement agencies, including "Support Labor Service" and "Staffing Etc."  (R. at 67.)  He worked at "Greenbrier Rail Services" in 2000.  (R. at 68–69.)  His duties at the temporary placement agencies consisted of "construction cleanup."  (R. at 69.)  He could "not say" the lifting requirements of those jobs because it "varied" "depend[ing] on the debris that [he] had to" clean up or discard.  (R. at 71.)

Plaintiff also worked as a "welder" for several railroad companies for many years.  (R. at 71–72.)  He could not remember how long he worked for those companies.  (R. at 72.)  No job ever required him to lift more than 50 pounds.  (*Id.*)  Working as a welder, he lifted and carried items such as "rod boxes" and his tool box.  (R. at 73.)  A rod box weighed about 15 pounds.  (*Id.*)  Working in construction clean-up, he occasionally lifted items that weighed more than 50 pounds.  (R. at 75.)

Plaintiff believed that he was disabled and unable to work because his "suppression started when [he] was in elementary [school] or before."  (R. at 77.)  He called "suppression" "denial set aside, being manipulated," and "being prejudiced against."  (*Id.*)  His "depression" kept him from working because it "cause[d] [him] to … make wrong decisions," but he was also "very hyper."  (*Id.*)  He made wrong decisions because he was "set on doing one thing" and "all of the sudden" he did the opposite.  (R. at 78.)

Plaintiff had suffered from depression since he was in the fourth grade.  (R. at 79 –80.)  He was depressed almost every day and was hyper "part of the time."  (R. at 80.)  He was "hyper enough to move ... out of ... [his] depressive state."  (*Id.*)  In the past, he "used to love to work."  (*Id.*)  Currently, however, he could not work anymore because of "[his] mind and [his] body," "it

just seem[ed] like [he] [was] falling into a pit." (R. at 80.) He took Divalproax and Lithium to treat his symptoms. (*Id.*) His medications relieved his symptoms, and their only side-effect was irritability. (R. at 81.)

A Metrocare clinician noted that Plaintiff had lived in shelters for years, had "been on and off drugs and alcohol for several years," and he "did not want to work." (*Id.*) He did not want to work because it was "too difficult" for him, it hurt him "inside and physically." (*Id.*) He currently lived in "a temporary setting", but the following week he would be moving into "a permanent setting"—an apartment paid for by the Dallas Housing Authority. (*Id.*)

Plaintiff had difficulty with personal care, such as dressing, bathing, and grooming. (*Id.*) He could cook, clean, wash dishes, and do his own laundry, although he also "found it difficult." (*Id.*) He went grocery shopping. (*Id.*) He did not drive but could use public transportation independently. (R. at 82–83.)

Plaintiff did not get along well with others. (*Id.*) He and other people "just [did not] attract because of [his] history." (*Id.*) His mother, a psychiatric nurse, asked him if he "wanted to go on ... medication back" when he was a child because "she noticed the element in him when [he] was a kid." (R. at 84.) He did not want to take medication because he knew that other people were "affected … by these medications." (*Id.*) One day, he finally decided to get help. (*Id.*) He believed it was "too late" in his life to work again; he could not "physically put [himself] in [that] position," he "just [could not] do it." (*Id.*) He used to love to work, but now it "hurt[] [him] physically and mentally." (*Id.*)

In response to counsel's question, Plaintiff testified that when he worked as a welder, he worked in "demolition and construction." (R. at 86.) He would "tear down" things like door frames

and struts so they could be rebuilt. (*Id.*) He welded things together like "support buildings." (*Id.*) He used a "cutting torch" and a "welding torch." (*Id.*) He could "not tell" how long he spent "welding" in the past 15 years. (R. at 87.) The longest he ever held a job was three years, when he was a "foundry worker" at "Texas Steel in Fort Worth." (*Id.*) He tested "stress cracks" "[i]n casks for certain pieces." (*Id.*) After that, he worked for various temporary agencies, doing short-term projects. (*Id.*)

Plaintiff's mother identified his "psychiatric symptoms" in his early childhood such as his hyperactivity," he "was real hyper." (R. at 90.) He "thought she asked [him]" to get on medication "because of the suppression that [he] was going through." (*Id.*) He was diagnosed with bipolar disorder at Metrocare. (*Id.*) His psychiatrists told him his disorder was "primarily depressive," but he did not "[k]now why they would say that because [he] would tell them otherwise," "that [he] [had] ... many manic episodes." (R. at 91.) His depression "[came] to [him] through the spirit," he was "being led one way, and all of the sudden, [he] [was] directed into another [way], ... by people, ... [by] friends, and things like that." (R. at 93.) He did not want to get out of bed some days because of "lack of sleep;" he was indecisive; he did not know what to do, "either to go to work or stay or just...." (*Id.*) He also experienced "fear and anxiety." (R. at 94.) He feared "getting stuck" and not knowing what to do next. (*Id.*) He thought maybe he "should ... just stand still and allow the Lord to do his work ... his will," but he just did "not know." (*Id.*)

Plaintiff did not want to work because he was "getting older and [his] body [was] not the same, ..." it was "difficult for [him] to do small things." (R. at 95.) It "hurt[] [him] physically inside to do small things, ..." and "getting out in society trying to work ... would be even worse." (*Id.*) He experienced chest pains, back pains, it just hurt him "physically." (*Id.*) He did not get along well

with others, it was a "struggle because" he had not "progressed like [he] should have," he was always "in somebody's way or this and that."  (*Id.*)  He had "difficulty getting in and out of bed" on average 20 days out of every month.  (*Id.*)

Plaintiff was "markedly limited" in his "ability to understand and remember and carry out instructions."  (R. at 98.)  He did not know the reason for that, but in the past two years, he had noticed that his "brain" was "not the same."  (*Id.*)  He had trouble understanding what people said to him and had problems with his memory.  (*Id.*)  Within the past ten years, he had experienced "decompensation" and it was "not a good feeling."  (R. at 99.)  His "long term memory [was] good" but his "short term memory [was] not well at all."  (*Id.*)  He could "remember and recognize faces" but he forgot names "in a second."  (*Id.*)  He had difficulty "getting things done," it became "more difficult ... each day."  (*Id.*)  He did not know "how long, in the course of an hour," he was able to concentrate on any given task.  (*Id.*)

On re-direct examination by counsel, Plaintiff testified that he worked as a welder for Texas Steel in Fort Worth for "three years."  (R. at 106–07.)  He could not remember how long he worked as a car driver at Mart Inc.  (R. at 108.)

       ***c.***      ***Vocational Expert testimony***

A vocational expert (VE) also testified at the hearing.  (R. at 100.)  The ALJ first asked the VE whether her opinions would "be consistent with the Dictionary of Occupational Titles" (DOT), and the VE responded in the affirmative.  (R. at 102.)  The VE classified Plaintiff's past relevant work as a foundry worker (heavy, unskilled, SVP-6), welder (medium, skilled, SVP-6), construction worker (heavy, unskilled, SVP-2), and car driver (light, unskilled, SVP-2).  (R. at 102–03.)  The VE then clarified that the car driver job might not be "past relevant work" because it "occurred" after

Plaintiff's alleged onset date. (R. at 103.) The VE did not know whether Plaintiff "performed each of [those] jobs long enough to know how to perform their essential duties with at least an average degree of proficiency." (*Id.*) Based on Plaintiff's testimony and other evidence in the record, the VE opined that he probably worked long enough "to make [those] jobs significant past employment." (R. at 103–06.) After the re-direct examination of Plaintiff, the VE "redact[ed]" her testimony that he worked as a foundry worker. (R. at 108.) The VE opined that he worked as a welder, a construction worker, and a car driver "long enough to know how to perform the [respective] duties." (R. at 108–09.)

The ALJ asked the VE whether a hypothetical person with Plaintiff's age, education, and job experience could perform his past relevant work, either as Plaintiff actually performed it or as the jobs are customarily performed in the national economy, with the following limitations: understanding, remembering, and carrying out simple instructions; performing simple tasks; no interaction with the public; only occasional interaction with supervisors and co-workers; and never work where drugs and alcohol "are commonly found such as pharmacies, liquor stores, medical facilities, restaurants, and bars." (R. at 110.) The VE responded that the hypothetical person could perform Plaintiff's past relevant work as a car driver and a construction worker. (*Id.*) The VE had a "very difficult time discerning how [Plaintiff] described" the construction worker job, but she opined that the hypothetical person could perform the job as it was described in the DOT. (*Id.*)

The ALJ modified the hypothetical by adding the limitation that "the job be low stress, defined as not requiring the performance of supervisory tasks, not requiring multi-tasking, requiring only simple decisions, and not requiring any rapid production quotas or deadline pressures." (R. at 110–11.) After explaining that "all jobs [would] have some quotas and ... time-frames with[in]

which they need[ed] to be performed," the VE opined that the hypothetical person could still perform the jobs of car driver and construction worker.  (R. at 112.)  The VE stated that her testimony was consistent with the DOT, except that the DOT did "not address workplaces that have drugs and alcohol, or the rapid quotas and deadline pressures" limitations.  (*Id.*)

After counsel added the limitation that the person "would miss several [unscheduled] days ... from work each month," the VE opined that he would be unable to maintain competitive employment.  (R. at 112–13.)  The VE opined that the person would "need to be on task" "at least 90 percent of the time" in order to maintain competitive employment.  (R. at 113.)

## C.    **ALJ's Findings**

The ALJ issued his decision denying benefits on April 28, 2010.  (R. at 33–41.)  At step one, he found that Plaintiff met the insured status requirement through September 30, 2011.  (R. at 35.)  He also found that Plaintiff worked after his alleged onset date, but his work "did not rise to the level of substantial gainful activity."  (*Id.*)  At step two, he found that Plaintiff had two severe impairments: alcohol and cocaine abuse and bipolar disorder.  (R. at 36.)  Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that satisfied the criteria of any impairment listed in the social security regulations.  (*Id.*)  Next, the ALJ determined that Plaintiff had the RFC to perform "a full range of work at all exertional levels" with the following limitations: the ability to understand and carry out only simple instructions; no interaction with the public; occasional contact with and respond appropriately to co-workers and supervisors; never work in an environment where drugs and alcohol are present; and restricted to a low stress environment with no supervisory tasks to perform, only simple decisions to make, no multi-tasking, and no rapid production quotas or deadline pressures.  (R. at 37.)

At step four, based on the VE's testimony, the ALJ found that Plaintiff could perform his past relevant work as construction worker II, (heavy, unskilled, SVP-2), and determined that this job did "not require the performance of work related activities precluded by [Plaintiff's] [RFC]." (R. at 41.) Accordingly, the ALJ determined that Plaintiff was not disabled at any time between his alleged onset date of July 21, 2007 and the date of the ALJ's decision. (*Id.*)

## II. ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.      **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759

F.2d 432, 435 (5th Cir. 1985).   Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work,

other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse and remand the Commissioner's decision "for calculation and awarding of benefits," or to remand "for a new hearing and decision." (P. Br. at 25.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id*. at *11 (citation omitted). Inconsistencies and unresolved issues

in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718

(5th Cir. 2005) (per curiam). The Commissioner, not the court, resolves evidentiary conflicts.

*Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.** **Issues for Review**

Plaintiff presents the following issues for review:

(1)    Whether Mr. Paul is *Per Se* Disabled Under Medical Listing 12.04.

(2)    Whether the ALJ Failed to Properly Weigh the Medical Evidence.

(3)    Whether the ALJ Failed to Properly Evaluate Plaintiff's Credibility.

(4)    Whether the ALJ Relied Upon Flawed Vocational Expert Testimony.

(Pl. Br. at 1.)

**C.** **Plaintiff's Credibility[4]**

Plaintiff argues that the ALJ failed to properly evaluate his credibility and that his findings

that Plaintiff used drugs, was not compliant with his treatment, and did not want to work were not

supported by the record. (Pl. Br. at 19–23.)

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944

F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility

because he "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v.*

*Shalala*, 27 F.3d 160, 164 n.18 (5th Cir. 1994). In evaluating a claimant's subjective complaints,

the ALJ must follow a two-step process. SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).

---

[4] The credibility issue is addressed first because in determining severity at step two, the ALJ explained that he "severely discounted" the weight he gave "to the opinions in Metrocare records of the severity and incapacitating effect of [Plaintiff's] mental impairments," in part because they were based on Plaintiff's "own discounted assertions of his own symptoms." (R. at 40.)

First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Next, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects of those symptoms are not substantiated by objective medical evidence, the ALJ must assess the credibility of the claimant's statements. *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effects. SSR 96-7p, 1996 WL 374186, at *2. Additionally, the regulations provide a non-exclusive list of factors that the ALJ must consider. *See* 20 C.F.R. § 404.1529(c) (2011).[5] Nevertheless, the Fifth Circuit has held that the ALJ is not required to follow "formalistic rules" in assessing credibility, and he must articulate his reasons for rejecting a claimant's subjective complaints only "when the evidence clearly favors the claimant." *Falco*, 27 F.3d at 163.

Ultimately, the mere existence of pain is not an automatic ground for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citations omitted). Likewise, an individual's statements

---

[5] These factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3.

regarding pain and other symptoms alone are not conclusive evidence of a disability and must be supported by objective medical evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged.  42 U.S.C.A. § 423(d)(5)(a) (West 2004).

Here, "[a]fter careful consideration of the evidence," the ALJ determined that although Plaintiff's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," his "statements concerning the intensity, persistence, and limiting effects of [his] symptoms [were] not credible to the extent they [were] inconsistent" with the ALJ's RFC assessment. (R. at 38.) The ALJ first noted Plaintiff's hearing testimony and statement to Metrocare clinicians that he did "not want to work." (R. at 38, 81, 407.) On January 21, 2009, Plaintiff told clinician Garrison that he "did not want to work." (R. at 372.) Four months later, during a psychological evaluation, clinician Murphy noted that Plaintiff had "no need or desire to work." (R. at 401.) The ALJ found that Plaintiff's "history of incarceration for fraud" further impeached his credibility, and he noted that Plaintiff "earned five figures" during only 4 of the past 15 years. (R. at 38, 53–55.) The ALJ found that Plaintiff had "shown an unwillingness to change," as evidenced by "his continu[ed] ... drug use and refusal to attend Narcotics Anonymous and anger management classes." (Id.) Plaintiff admitted having had a drug problem and told a clinician that was his "only way" of coping with his homelessness and unemployment in March 2008; on October 21, 2008, he reported using cocaine the week before and claimed it helped him relieve his anger, put him back "into perspective," and made him feel better. (R. at 325, 360.) The clinician had noted that he was abusing drugs; he refused to attend narcotics anonymous, stating that it would not help him; and he did not express a desire to stop using drugs. (R. at 360–61.) Treatment notes from May 15, 2009 reveal that he had last used cocaine on April 3, 2009. (R. at 422.)

The ALJ also considered a clinician's observation that Plaintiff appeared "to be very knowledgeable, intelligent, and stabilized" with his medications.  (R. at 38.)  On September 20, 2007, Plaintiff told NP Simmons that he was stable on his current medications, he did not have any mood swings, and he was sleeping and eating well.  (R. at 308.)  Although he testified that he was disabled due to his depression, Plaintiff told a clinician in January 2008, that his medications stabilized his mood and depression and he was sleeping five to eight hours a night.  (R. at 324.)  That month, he reported only occasional agitation and irritability due to his lack of housing.  (R. at 321.)  While he testified that his mental impairments caused him to make "wrong decisions," on April 21, 2009, he reported improvement with his symptoms, shared that he was "able to control himself," and believed that his medications were helping.  (R. at 419.)  The following month, he was doing "just fine" and everything was going along well.  (R. at 492.)  By October 5, 2009, his thoughts were clear and goal-oriented; he displayed an "inquisitive and bright" affect; he was alert and oriented; his progress was "marked" due to his good resolve, positive attitude, medical compliance, and reduction in anger and anxiety episodes; and he was able to "problem-solve" through his barriers.  (R. at 544–45.)  The following week, he was being "patient" and looking forward to the future.  (R. at 549.)  He testified that his medications helped and their only side-effect was irritability.  (R. at 81.)

Lastly, the ALJ considered Plaintiff's day-to-day activities, noting that he could cook, clean, wash dishes, do laundry, use public transportation independently, shop, read, study, and take daily walks.  (R. at 36–37, 398.)  The ALJ could consider this evidence, as long as he did not place "exclusive reliance on [Plaintiff's] daily activities" in determining disability.  *See Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).

The ALJ properly considered the evidence regarding Plaintiff's mental impairment and its

symptoms, including his hearing testimony and his statements to treating physicians, and provided a reasoned analysis in support of his credibility assessment.  Moreover, the ALJ was not required to articulate his reasons for rejecting Plaintiff's subjective allegations in full detail because the evidence as a whole did not "clearly favor" him.  Although not in a formalistic fashion, the ALJ considered the factors for assessing credibility and relied on substantial evidence, including Plaintiff's own statements, to support his credibility determination.  Even if the ALJ erred in finding that Plaintiff was non-compliant or in pointing to his statements that he did not want to work, remand is not required because the ALJ's credibility determination was substantiated by other evidence of record.  *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (applying harmless error analysis to an ALJ's credibility determination); *see also Prince v. Barnhart*, 418 F. Supp. 28 863, 872 (E.D. Tex. 2005) (explaining that because "[w]eighing conflicting evidence is the prerogative of the fact-finder," harmless error analysis applies to an ALJ's credibility determination, even if his decision is "self-contradictory").

Because substantial evidence supports the ALJ's credibility determination, remand is not required on this issue.

**D.    Listed Impairment and Treating Physician Rule[6]**

Plaintiff argues that remand is required because the ALJ erred at step three of the sequential evaluation process by improperly determining that his bipolar disorder did not meet the requirements of Listing 12.04 for affective disorders.  (P. Br. at 13–15.)  He further contends that the ALJ erred

---

[6]  Although Plaintiff lists and briefs these issues separately, he essentially argues that the ALJ erred at step three in determining that his bipolar disorder did not meet the requirements of Listing 12.04 by improperly rejecting, without discussion, Dr. Ali's treating opinions.  Accordingly, these issues are addressed together.

at this step because he improperly rejected the opinions of Dr. Ali, his treating psychiatrist, in favor of non-treating, non-examining SAMCs' opinions.  (*Id.* at 14, 16–19.)

### 1.    Step Three Analysis

If a claimant is not working and is found to have a severe impairment at step two that meets the duration requirement, the ALJ must determine at step three whether the claimant's impairment meets or medically equals one of the impairments listed in the regulations.[7]  *Compton v. Astrue*, No. 3:09-CV-0515B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. § 404.1520).  If the claimant's impairment meets or medically equals a listed impairment, the disability inquiry ends and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d) (2012).  The claimant has the burden of proving that her impairment or combination of impairments meets or medically equals one of the listings.  *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).  To meet a listed impairment, the claimant's medical findings, *i.e.*, symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment.   20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  To equal a listing, the claimant's unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 404.1526(a).  The claimant shows that his unlisted impairment or combination of impairments is "equivalent" to a listed impairment by presenting medical findings equal in severity to *all* the criteria for the most analogous listed impairment.  *Sullivan*, 493 U.S. at 529–31; *see also* 20 C.F.R. § 404.1526(b)(2).

Here, Plaintiff contends that he meets the requirements for listing 12.04(A)(3)-(B) because

---

[7]  These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

"he has been diagnosed with bipolar disorder, mixed, with ... episodes of both depression and

mania." (P. Br. at 14.)  Alternatively, he argues that he meets listing 12.04 (A)(1)-(B) "based on his

depression with more than four of the criteria listed."  (*Id.*)  Listing 12.04  provides:

> 12.04  Affective Disorders:  Characterized by a disturbance of mood,
> accompanied by a full or partial manic or depressive syndrome.  Mood refers to a
> prolonged emotion that colors the whole psychic life; it generally involves either
> depression or elation.
>
> The required level of severity for these disorders is met when the requirements in
> both A and B are satisfied....
>
> A.  Medically documented persistence, either continuous or intermittent, of one of
> the following:
>
>> 1.  Depressive syndrome characterized by at least four of the
>> following:
>>> a. Anhedonia or pervasive loss of interest in almost all activities;

or

>>> b. Appetite disturbance with change in
>>> weight; or
>>> c. Sleep disturbance; or
>>> d. Psychomotor agitation or retardation; or
>>> e. Decreased energy; or
>>> f. Feeling of guilt or worthlessness; or
>>> g. Difficulty concentrating or thinking; or
>>> h. Thoughts of suicide; or
>>> i. Hallucinations, delusions or paranoid
>>> thinking; or
>>>> ....
>
>> 3. Bipolar syndrome with a history of episodic periods
>> manifested by the full symptomatic picture of both manic and
>> depressive syndromes (and currently characterized by either
>> or both syndromes);
>
> AND
>
> B.  Resulting in at least two of the following:
>
>> 1.  Marked restriction of activities of daily living; or

> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(A) and (B) (2012).

Here, at steps two and three, in determining whether Plaintiff's mental impairments were severe and whether any such impairment met or medically equaled a listed impairment, the ALJ compared his bipolar disorder to listing 12.04 for "affective disorders" and his alcohol and cocaine addiction to listing 12.09 for "substance addiction disorders." (R. at 36–37.) The ALJ first considered whether Plaintiff's mental disorders satisfied the paragraph B criteria. (*See id.*) He determined that Plaintiff had moderate restrictions in his "activities of daily living," "social functioning," and in maintaining concentration, persistence, and pace and had "experienced no episodes of decompensation." (R. at 36.)

At step three, because Plaintiff's mental impairments did not result in "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation," the ALJ concluded that the paragraph B criteria were "not satisfied." (R. at 37.) He "also considered whether the 'paragraph C' criteria [were] satisfied" and found that "the evidence fail[ed] to establish the presence of the [those] criteria."[8] Accordingly, the ALJ concluded that Plaintiff's "mental impairments, considered singly and in combination, [did] not meet or medically equal the criteria of listings 12.04 and 12.09." (*Id.*)

In reaching this finding, the ALJ implicitly referenced Dr. Meyer's consultative PRTF from

---

[8] The paragraph C criteria are not discussed here because Plaintiff bases his contentions on the criteria of paragraphs A and B only.

March 27, 2009, noting that Plaintiff read, studied, took "walks throughout the day," could "prepare

meals," "[took] public transportation and shop[ped]," and "attend[ed] social groups." (*See* R. at 36,

386–99.) He also referenced Metrocare treatment notes revealing that a clinician "advised [Plaintiff]

to get a job if he wanted income, ... indicating a belief in his ability to work." (R. at 36, 404.)

Notably, in his step three analysis, the ALJ never considered, or even mentioned, Dr. Ali's January

26, 2010 medical assessment of ability to do mental work-related functions or his July 14, 2010

psychiatric impairment questionnaire, both of which indicated that Plaintiff's bipolar disorder caused

him marked restrictions in social functioning and in his ability to maintain concentration,

persistence, and pace.[9] (*See* R. at 553–55, 569–77.)

### 2.    *Dr. Ali's Opinions*

Plaintiff argues that the ALJ erred by failing to give controlling weight to Dr. Ali's findings

that he had "marked limitations in ... social functioning and activities involving concentration,

persistence, and pace," in favor of the opinions of non-treating, non-examining SAMCs. (Pl. Br. at

14, 16–19.) He argues that at a minimum, the ALJ was required to employ the six-factor analysis

found in 20 C.F.R. §§ 404.1527(c) and 416.927(c) because Dr. Ali's treating opinions were

supported by the record, and there was no competing, first-hand psychiatric or psychological

evidence to controvert them. (*Id.* at 18.) He contends that the ALJ's error prejudiced his claim

---

[9] In his January 2010 medical assessment, Dr. Ali opined that Plaintiff was "extremely limited" or had "no useful ability" to perform 10 mental work-related abilities, including his ability to carry out detailed but uninvolved instructions; maintain attention and concentration for two-hour periods; and accept instructions and respond appropriately to criticism from supervisors. (R. at 553–55.) He opined that Plaintiff was "substantially limited" in five abilities, including his ability to act appropriately with the general public and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (*Id.*) In his July 2010 questionnaire, Dr. Ali opined that Plaintiff was "markedly limited" in numerous areas, including his ability to understand and remember simple instructions; maintain attention and concentration for extended periods; and work in proximity to others without being distracted by them. (R. at 572–75.)

because all the factors "weigh[ed] in favor of crediting Dr. Ali's findings." (*Id.* at 18–19.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § § 404.1520b(b) and 404.1527(c) (2012). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(1) (2012). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Newton* , 209 F.3d at 455. If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." 20 C.F.R. § 404.1527(c) (1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good

cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Ordinarily, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis in *Newton*). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

From the ALJ's brief step three discussion, it appears that he considered only Dr. Meyer's consultative PRTF in determining whether Plaintiff's mental impairments met or medically equaled a listed impairment.  (*See* R. at 36–37, 386–99.)  Not only did he not give controlling weight to Dr. Ali's treating opinions, but he entirely failed to acknowledge or discuss them, even though they related to Plaintiff's paragraph B limitations.  At no point in his disability decision did the ALJ conclude that Dr. Ali's medical assessment and psychiatric questionnaire were conclusory or unsupported by the record.   *See Newton*, 209 F.3d at 456.  Nor did the ALJ find that there was "competing first-hand medical evidence" or that as a factual matter, another doctor's opinion was "more well-founded" than Dr. Ali's opinions. *See id.* at 458.

In a subsequent step of the sequential analysis, the ALJ explained that he "severely discounted" "the weight to be given to the opinions [provided] in Metrocare records" in part because

a treating clinician, "acting in her capacity as a credentialed" mental health professional, advised Plaintiff to "to conceal [his] work and earnings from the [SSA] by working only for cash." (*See* R. at 36–37, 40, 372.) Nevertheless, while such advice by part of Dr. Ali could reasonably impeach his credibility and even constitute "good cause" for rejecting his psychiatric opinions, the ALJ supplied no reason for attributing the clinician's statement to him. The clinician made this statement in January 2009, but Dr. Ali did not begin treating Plaintiff until January 2010. (*See* R. at 372, 553.) Moreover, there is no indication that Dr. Ali ever trained or supervised the clinician, or otherwise directed or approved of her advice to Plaintiff. While the ALJ explained that the clinician's advice showed her "belief in [Plaintiff's] ability to work," determination of a claimant's capacity to engage in substantial gainful activity is not a medical opinion, but rather a legal conclusion that is reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(e); *Frank*, 326 F.3d at 620. By contrast, Dr. Ali's opinions regarding Plaintiff's work-related mental limitations were not medical source opinions on an issue reserved to the Commissioner under 20 C.F.R. § 404.1527(e).

The ALJ committed error by failing to present good cause for rejecting Dr. Ali's treating opinions or analyze them under the factors listed in 20 C.F.R. § 404.1527(c).[10] *See Compton*, 2009 WL 4884153, at *9 (finding error where the ALJ did not consider a treating source opinion in determining whether the claimant's mental impairment met or equaled a listed impairment, and the ALJ failed to analyze the opinion using the relevant factors or present good cause for rejecting it); *see also Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (An "ALJ must consider all the record

---

[10]   The ALJ was entitled to reject other opinions of Dr. Ali, including his June 14, 2010 disability letter in which he opined that Plaintiff's "symptoms [had] contributed to his inability to maintain work", because a disability determination is reserved for the Commissioner. *See Frank*, 326 F.3d at 620.

evidence and cannot 'pick and choose' only the evidence that supports his position.").

The Commissioner contends that any error in evaluating Dr. Ali's opinion is harmless because the ALJ properly "discounted the evidence from Metrocare," "Dr. Ali's employer," as "unsupported, inconsistent with other substantial evidence, ... and based on [Plaintiff's] properly discounted characterizations of his own limitations."[11]  (*Id.* at 7.)  She contends that substantial evidence supports the ALJ's step three determination.  (D. Br. at 9.)

"The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council", however.  *Newton*, 209 F.3d at 455; *accord Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) (per curiam) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.")  The ALJ committed legal error by failing to give reasons for rejecting Dr. Ali's medical assessment and psychiatric questionnaire as they related to listings 12.04(A)(1)-(B) and 12.04(A)(3)-(B).  *See Compton*, 2009 WL 4884153, at *9.  Although an ALJ may reject a treating physician's opinion when the physician lacks credibility, the ALJ must find "with support in the record, that the physician is not credible and is 'leaning over backwards to support the application for disability benefits.'"  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  Here, the ALJ did not make such a finding because he failed to provide a valid reason for attributing to Dr. Ali, the clinician's improper advice to Plaintiff.

Nevertheless, the Fifth Circuit has held that when the ALJ commits legal error at step three, the court must still consider whether the error was harmless.  *See Audler v. Astrue*, 501 F.3d 446,

---

[11]  The Commissioner refutes Plaintiff's allegation that "the ALJ did not mention the opinion of [Dr. Ali]" by explaining that "he explicitly referred to a questionnaire that Dr. Ali completed in January 2010." (D. Br. at 7.) Nevertheless, this reference by the ALJ was not to acknowledge, and much less to explain the weight he gave to Dr. Ali's opinion, but it was simply to state that Dr. Ali's assessment was "admitted into the record as Exhibit[] 8F." (R. at 33.)

448 (5th Cir. 2007) ("Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless.")  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank*, 326 F.3d at 622).

Here, the ALJ found at step three that Plaintiff's bipolar disorder did not meet the listing for 12.04 basing his finding solely on Dr. Meyer's consultative PRTF and mental RFC.  (R. at 36–37.)  The ALJ did not consider, or even mention, Dr. Ali's treating opinions that Plaintiff had "no useful ability" in numerous mental work-related abilities, which indicated that he had marked restrictions in social functioning and in maintaining concentration, persistence, and pace.  Consequently, he did not consider whether Plaintiff's mental limitations met the paragraph B criteria.  He therefore did not consider whether Plaintiff's bipolar disorder was severe enough to meet the listed impairment under 12.04 (A)(1)-(B) or 12.04 (A)(3)-(B).  The ALJ's step three error was not harmless because it is not inconceivable that he would have reached a different conclusion had he considered Dr. Ali's opinion.

Accordingly, the case should be remanded with directions to the ALJ to apply the correct legal standard as set forth in *Newton*.  *See Moore v. Sullivan*, 895 F.2d 1065, 1070 (5th Cir. 1990) (holding that when the Commissioner "has relied on erroneous legal standards in assessing the evidence, he must reconsider" his decision under the correct legal standard); *accord Cline v. Astrue*, 577 F. Supp. 2d 835, 850 (N.D. Tex. 2008).  Because the ALJ's step three error necessarily impacts

the two remaining steps in the sequential analysis, the Court does not reach Plaintiff's fourth issue.
[12]

### III.   RECOMMENDATION

Plaintiff's motion should be **GRANTED in part**, Defendant's motion should be **DENIED**

**in part**, and the case should be **REMANDED** to the Commissioner for further proceedings.

**SO RECOMMENDED**, on this 14th day of March, 2013.


_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[12] Plaintiff has not met his "heavy burden" to prove disability because there are unresolved issues in the record to be determined upon remand.  His request for disability benefits at this stage of the proceedings should therefore be denied.